**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

MARYELLEN D.,[1]

|  |  |  |
|---|---|---|
|  | Plaintiff, | 5:17-cv-00294 (BKS) |

v.

NANCY A. BERRYHILL, Acting Commissioner of Social
Security,

|  |  |
|---|---|
|  | Defendant. |

---

**Appearances:**

*For Plaintiff:*
Howard D. Olinsky
Olinsky Law Group
One Park Place
300 South State Street, Suite 420
Syracuse, NY 13202

*For Defendant:*
Grant C. Jaquith, United States Attorney
Kristina Cohn, Special Assistant United States Attorney
Social Security Administration
Office of Regional General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Maryellen D. ("Plaintiff") filed this action under 42 U.S.C. § 405(g), seeking review of a

decision by the Acting Commissioner of Social Security denying her application for Disability

Insurance Benefits ("DIB"). (Dkt. No. 1). The parties' briefs, filed in accordance with N.D.N.Y.

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect her
privacy.

General Order 18, are presently before the Court. (Dkt. Nos. 10, 11). After carefully reviewing the Administrative Record (Dkt. No. 9) and considering the parties' arguments, the Court affirms the decision of the Commissioner.

## II.    BACKGROUND

### A.    Procedural History

On June 24, 2013, Plaintiff filed an application for disability benefits, with an onset date of May 31, 2012. (R. 71). She claimed that she was disabled due to stroke and spinal stenosis. (R. 71). Plaintiff's application was denied on August 21, 2013. (R. 78). On October 8, 2013, she requested a hearing before an Administrative Law Judge (the "ALJ"), (R. 90–91), which was held before ALJ Elizabeth W. Koennecke on two dates: March 2, 2015, at which time Plaintiff testified, (R. 44–59); and September 29, 2015, when the ALJ heard vocational expert testimony after additional evidence was submitted, (R. 60–70). On October 9, 2015, ALJ Koennecke issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 10–21). The Appeals Council denied Plaintiff's request for review of the ALJ's decision on January 12, 2017. (R. 1–6). On March 14, 2017, Plaintiff commenced this action. (Dkt. No. 1).

### B.    Plaintiff's Background and Testimony

Plaintiff was 55 years old on May 31, 2012 (the onset date) and 59 years old on the date of the ALJ's decision. (R. 71). She completed one year of college, (R. 271), and worked at Cooper Crouse-Hinds (now Eaton Crouse-Hinds) for 32 years as an accounts receivable and payable clerk until May 2012, (R. 49, 316). In her application for disability benefits, Plaintiff stated that she was unable to work due to disability as of May 31, 2012. (R. 71).

At the March 2, 2015 hearing before the ALJ, Plaintiff recounted that, after her stroke in 2010, she experienced numbness and pain on her "left side," including the lip, left arm and fingers, middle and lower back, and down her left leg; she explained having difficulty moving

her left-hand fingers. (R. 51). As a result, she had an "off balance feel." (R. 51). Although her left arm was not "useless," she did not "have any strength in it" and could not lift a gallon of milk. (R. 53–55). Her difficulty was "all on [her] left." (R. 55).

Plaintiff testified that she lived in a house with her partner of 20 years, and had a driver's license but did little driving because she was on medication for her seizures. (R. 49). In her condition, she was unable to do laundry, vacuum, or carry groceries. (R. 54). Additionally, she said she had "a mild case of spinal stenosis," but a "bigger problem" was her "severe arthritis in the lower back." (R. 51). The condition was painful, and Plaintiff had to lie down "many times during the day" with a heating pad or ice. (R. 52). Plaintiff explained that she went to physical therapy for her leg, arm, and back, but it was "so expensive" and her condition did not improve. (R. 53). Plaintiff stated she could sit for 30 minutes to an hour at a time and then would need to stand up, lie down, or walk. (R. 54). She could stand for 30 or 45 minutes. (R. 55).

After the stroke, Plaintiff found it "very hard" to "keep up the pace" at her company, and she believes this was the reason she was laid off. (R. 50). Her condition made working there "pretty stressful," and she was not able to concentrate as she used to because of the pain; she was "sitting too long," her "back would hurt," and she would have to stand up. (R. 56). They gave her back devices so that she could "try to sit longer," but she could not do her work "full capacity"; it was "too much" to bear "without constant breaks." (R. 56).

In response to the ALJ's questioning, Plaintiff acknowledged claiming and collecting unemployment benefits after the onset day of May 2012 through all of 2013, which indicated that she was "ready and able and willing to work." (R. 57). Additionally, Plaintiff explained that she believed physical therapy would help her "get better." (R. 57).

### C.    Medical Evidence

On September 27, 2010, Plaintiff was admitted at St. Joseph's Hospital for a stroke. (R. 453). She complained of numbness and weakness on her left side. (R. 455). An MRI of her head revealed acute right infarction with mild mass affect, mild nonspecific white matter changes, and membrane thickening in the right maxillary sinus. (R. 455). A carotid Doppler showed bilateral calcified plates. (R. 455). In his consultation notes, neurologist Antonio V. Marasigan, M.D., noted that Plaintiff "feels that the left arm and leg were somewhat heavy," and that "[r]apid alternating movements and fine movements of the left hand were slightly impaired on the left side." (R. 453). Having reviewed the MRI, Dr. Marasigan noted that it "showed a right thalamic infarct," and opined that the "findings of clumsiness on the left side could explain the right thalamic infarct." (R. 453). Upon her discharge on September 29, 2010, Plaintiff received diagnoses of cerebrovascular accident secondary to microvascular disease and acute right infarction, and was prescribed amlodipine, aspirin, and Trileptal. (R. 455).

Plaintiff visited Paul A. Fiacco, M.D. on June 15, 2011 with complaints of "being tired all the time and bruising easily." (R. 402). He referred her to cardiology for a "cardiac work up." (R. 403). He also noted that Plaintiff had had epilepsy "since she was about 25" but had "not had any seizures in about 20 years." (R. 403). Dr. Fiacco advised that Keppra, Plaintiff's antiseizure medication, could be responsible for the fatigue, but since her neurologist, Hassan Shukri, M.D., stated she needed to stay on the medication, Dr. Fiacco discussed the possibility of decreasing the dosage. (R. 403). Plaintiff returned on October 5, 2011, complaining that she had been feeling lightheaded for two days. (R. 399). The nurse at her workplace had measured low blood pressure, but Dr. Fiacco found that her blood pressure was "good." (R. 399–400).

On October 27, 2011, Plaintiff was examined by cardiologist Russell Silverman, M.D., who performed a carotid ultrasound and found marked calcification, intimal thickening, and

heavy calcific plaquing. (R. 396–97). Having diagnosed "[s]evere atherosclerotic disease with intimal thickening and calcific plaquing but no significant flow obstructing lesions," Dr. Silverman recommended "aggressive risk factor modification and close followup of her carotid disease." (R. 397).

Plaintiff was treated by James Tarala, M.D., on November 21, 2011, for complaints of dizziness. (R. 393). According to her subjective report, she felt "off balance," her knees felt like they were "going to lock up," and she felt as if she was "going to fall." (R. 393). She stated it was hard to walk and she had to hold onto things while walking. (R. 393). Dr. Tarala found "serious effusion" of her tympanic membranes; for her dizziness symptoms, he prescribed meclizine and an over-the-counter allergy medication to drain fluid from her ears; additionally, he ordered an MRI of her brain. (R. 394).

On December 6, 2011, Plaintiff returned to Dr. Fiacco because of continued dizziness. (R. 390). Plaintiff told him that her neurologist, Dr. Shukri, advised against the MRI. (R. 390). Dr. Fiacco examined Plaintiff and found horizontal nystagmus (uncontrolled movement) of both eyes. (R. 391). He further noted that Plaintiff was taking half the dose of amlodipine but still complained of dizziness, so he advised that she take meclizine. (R. 391). On the same day, Plaintiff visited Dr. Shukri concerning complaints of feeling jittery, anxious, and off balance. (R. 414). He prescribed citalopram for her anxiety and noted that, if she did not respond to the medication, he would consider ordering an MRI of the brain. (R. 415). Plaintiff saw Dr. Skukri again on March 12, 2012 for a checkup. (R. 416). Plaintiff had "no new complaints" and reported that her hypertension and hyperlipidemia were well controlled; the doctor prescribed that she continue taking Keppra and noted that as "long as she is stable we will be seeing her back in 1 year in followup." (R. 416–17).

Plaintiff visited Dr. Silverman on September 3, 2012 for complaints of dizziness and increased dyspnea on exertion. (R. 350–51). He had "a low suspicion of ischemia" but noted that Plaintiff had "multiple risk factors." (R. 351). The examination exposed "some mild residual sensory defect" in the left leg. (R. 352). He ordered a stress echocardiogram, (R. 352), which showed no evidence of ischemia but indicated left ventricular hypertrophy, biatrial enlargement, mitral and tricuspid insufficiency, and mild atherosclerotic change of the aorta, (R. 355).

On February 14, 2013, Plaintiff saw Dr. Fiacco for complaints of shortness of breath and dizziness, which was described a side effect of medication. (R. 383). Dr. Fiacco discontinued her amlodipine and prescribed Ramipril to reduce stroke risks. (R. 385). He also discussed "the need and urgency for her to quit smoking." (R. 385). As Plaintiff complained of lower back pain radiating down her leg, the doctor ordered x-rays. (R. 385). The results showed: mild left convex curvature of the upper lumbar spine; anterior spurring, Schmorl's nodes, and facet joint disease at multiple levels; and retrolisthesis and moderate to severe disc space narrowing at L2–L3. (R. 382). Plaintiff underwent an MRI on March 11, 2013, which showed "[s]evere arthritis of both foramina L4–5" and "[m]ild spinal stenosis L4–5 with an annular bulge." (R. 380). Plaintiff returned to Dr. Fiacco on March 14, 2013 with complaints of dizziness and fatigue. (R. 377). He advised her to decrease her Ramipril dose and referred her to an orthopedic surgeon with regard to her MRI results. (R. 378–79).

Dr. Shukri examined Plaintiff on April 22, 2013 after she was diagnosed with left lumbosacral radicular pain radiating to her left foot. (R. 418). He noted "[i]ncreased tone in her left upper and lower extremities with mild hyperreflexia in the left compatible with residual stroke." (R. 418). Dr. Shukri ordered "an EMG/nerve conduction study to see if there is any evidence of lumbosacral radiculopathy" and referred her to physical therapy (R. 418).

On May 1, 2013, Plaintiff visited orthopedic surgeon Robert S. Nolan, M.D. for complaints of pain across her lower back radiating down through her left buttock into her left leg. (R. 357). He noted her status as "s/p CVA" (post–cerebrovascular accident) with "residual left leg 'heaviness' without pain." (R. 359). Plaintiff told him that she had "noted decreased standing and ambulation" due to her lower back pain and left leg pain. (R. 359). She also mentioned that "sitting is best tolerated" but that "she always leans more" to the right to give her left leg some relief; further, she noted numbness and tingling in her left leg, and stated having "continued problems with imbalance." (R. 359). Dr. Nolan concluded that Plaintiff had degenerative joint disease of the lumbar spine, lumbar stenosis, and lumbar spondylolisthesis. (R. 360). He ordered x-rays of the lumbar spine and, having discussed both conservative treatment options and surgical intervention, encouraged Plaintiff to try physical therapy. (R. 361).

The following day, on May 2, 2013, Plaintiff saw Dr. Fiacco and told him that her dizziness was "much better." (R. 376). He noted that Plaintiff had declined "pain medications as she has seen too many people close to her become addicted." (R. 376).

An EMG nerve conduction study, conducted on May 16, 2013, confirmed that Plaintiff had mild bilateral L4–L5 radiculopathy. (R. 419). Dr. Shukri's notes indicate that Plaintiff would continue her conservative treatment with physical therapy, pain management, and home exercise, but that if her symptoms did not improve, Plaintiff would consider surgical treatment. (R. 419). Plaintiff started physical therapy on May 21, 2013 at St. Joseph's Hospital. (R. 474). In her initial evaluation, she indicated that "lifting even a ½ gallon of milk is painful" and that she was unable to vacuum, do laundry, garden, or take out the trash. (R. 474). The initial evaluation also notes that her balance and standing were impaired, secondary to decreased weight bearing on the

left lower extremity with antalgic gait, and that strength on the left side was impaired. (R. 473). Plaintiff scored 62% on the Oswestry Low Back Pain Disability Questionnaire, which meant she was crippled. (R. 471, 475). Her physical therapy goals were: (1) decrease lower back pain; (2) be independent with her home exercise plan for self-care; (3) increase lower extremity strength to allow her to stand for twenty to thirty minutes doing household activities with minimal or no pain; (4) abolish left lower extremity paresthesias to allow her to ambulate in the community without complaints of pain for thirty to sixty minutes; and (5) be able to lift laundry and trash. (R. 473). According to a discharge note, dated July 31, 2013, Plaintiff met one goal— that of abolishing pain with lumbar flexion—but discontinued physical therapy because of poor attendance and high insurance co-pay. (R. 469).

On April 1, 2014, Plaintiff visited Dr. Fiacco with complaints of fatigue. (R. 441–44). To address the fatigue, he advised that Plaintiff switch from Citalopram to Lexapro; further, he noted that her blood pressure was "on the low side" but kept her Ramipril prescription because it was "good for her heart." (R. 442).

Plaintiff was examined by Dr. Shukri on June 17, 2014 for complaints of left lumbosacral radicular pain. (R. 420). He noted that Plaintiff had a normal gait and no difficulty with toe, heel, or tandem walking. (R. 421). As for her reflexes, his notes show "1 at the knee" and indicate that the "[a]nkle reflex is absent bilaterally." (R. 421). He recommended that Plaintiff continue conservative treatment, and if her radicular symptoms persisted, he would consider another EMG nerve conduction study. (R. 421).

On October 28, 2014, Plaintiff saw Dr. Fiacco with complaints of chronic fatigue and dizziness. (R. 422). He diagnosed unspecified sleep apnea. (R. 423).

### D.    Opinion Evidence

#### 1.    Family Doctor – Paul A. Fiacco, M.D.

The record shows a February 10, 2015 "medical source statement" completed by Mallory Stachnik, a licensed practical nurse ("LPN"), and signed by Dr. Fiacco, which stated that Dr. Fiacco treated Plaintiff every six months, noted her diagnoses of transient ischemic attack and epilepsy, and identified various symptoms displayed by Plaintiff, including limited range of motion of upper extremity, problems concentrating, dizziness, loss of balance, loss of coordination, fatigue, slurred speech, and weakness or numbness in her fingers and toes. (R. 457). With regard to complications exhibited by Plaintiff "since the injury," Dr. Fiacco specified, among other things, paralysis of the lip and dysarthria (trouble with word-forming muscles). (R. 457). He estimated that, due to Plaintiff's functional limitations, she could sit for 30 minutes at a time "with pain" and stand for 10 minutes at a time; further, she could sit and stand/walk less than two hours a day. (R. 458). Dr. Fiacco opined that Plaintiff could perform manipulative and reaching activities with her left hand only "rarely" (i.e., from 1% to 5% of an eight-hour workday), could "rarely" lift or carry objects weighing less than 10 pounds, and could never lift or carry objects weighing 10 pounds or more. (R. 459). He added that Plaintiff was seriously limited in her ability to maintain attention for two hours and complete a workday without interruptions from psychologically based symptoms, and that she was unable to maintain regular attendance, be punctual, and perform at a consistent pace without taking many breaks. (R. 459). In his opinion, she would be off task more than 20% of the day and would miss more than four workdays per month. (R. 460).

#### 2.    Neurologist – Hassan Shukri, M.D.

Dr. Shukri also completed a "medical source statement" on February 23, 2015, stating that he treated Plaintiff once a year. (R. 462). He noted her lifetime diagnoses as epilepsy, right

thalamic stroke, and severe arthritis and stenosis at L4–L5 with left-sided weakness and numbness. (R. 462). Dr. Shukri listed her symptoms as including problems concentrating, dizziness, loss of balance, loss of coordination, fatigue, slurred speech, and weakness or numbness in her fingers and toes. (R. 462). He noted difficulty multitasking as well as dysarthria. (R. 462). In his opinion, Plaintiff was unable to work due to left-sided weakness. (R. 463).

### 3.    Vocational Expert – Rob Baker

At the hearing on September 29, 2015, the ALJ called Rob Baker, a vocational expert, to testify. (R. 62). He testified that a person of Plaintiff's age, education, work experience, and residual functional capacity ("RFC") could perform her past relevant work as a bookkeeper. (R. 64–65). In his opinion, she had acquired skills from her past work that could transfer to the positions of receptionist bookkeeper and general ledger bookkeeper. (R. 65–66). But if she could maintain her RFC for only four hours a day, she would not be able to find any full-time job. (R. 66). Likewise, she would not be able to find a full-time job if: she could only rarely reach, handle objects, lift or carry less than 10 pounds, maintain attention, or perform at a consistent pace; she required additional breaks, needed to be off task 20% of the workday, or had to miss work four days per month. (R. 67–68).

### E.    ALJ Decision Denying Benefits

On October 9, 2015, ALJ Koennecke issued a decision denying Plaintiff's claim for disability benefits. (R. 10–21). At step one of the evaluation process,[2] the ALJ determined that

---

[2] Under the five-step analysis for evaluating disability claims,

> if the Commissioner determines (1) that the claimant is not working, (2) that [s]he has a severe impairment, (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in [her] prior type of work, the Commissioner must find [her] disabled if (5) there is not another type of work the claimant can do.

Plaintiff had not engaged in any substantial gainful activity since the alleged onset date, May 31, 2012. (R. 12). At step two, the ALJ determined that, under 20 C.F.R. § 404.1520(c), Plaintiff had the following "severe impairments": degenerative joint disease in the lumbar spine and minimal residuals of a cerebral vascular accident. (R. 13–14). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (R. 14 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526)).

Before considering step four, the ALJ assessed Plaintiff's RFC[3] and found that she had the capacity to perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a),[4] provided the job allowed her to choose a sitting or a standing position to perform it. (R. 14). In making these findings, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (R. 14). The ALJ also stated that she "considered opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (R. 14).

---

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (alteration in original) (internal quotation marks omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

[3] The Regulations define residual functional capacity as "the most [a claimant] can still do despite" her limitations. 20 C.F.R. § 404.1545 (a)(1). The ALJ must assess "the nature and extent of [a claimant's] physical limitations and then determine . . . residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The Regulations further state that "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work." *Id.*

[4] C.F.R. § 404.1567(a) provides:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

In considering Plaintiff's alleged symptoms, the ALJ followed a two-step process: first, she determined whether there was an "underlying medically determinable physical or mental" impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms; and second, after finding such impairments, she evaluated the intensity, persistence, and limited effects of Plaintiff's symptoms to determine the extent to which they limited Plaintiff's functioning. (R. 16). Applying this two-step process, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Plaintiff's "statements concerning the intensity, persistence, and limited effects of these symptoms are no more than partially credible." (R. 17).

The ALJ discussed her weighing of the evidence as follows:

> The claimant has a fine work record extending over many years, which adds to her credibility. She had the stroke, attempted to return to work and her employer gave her a back device to help her sit, but she found it hard to keep up the pace. The stroke occurred in 2010, but the onset date was not until May of 2012. These factors bolster the credibility of her allegations, however other evidence indicates that the limitations are not as severe as alleged.

> Specifically, the medical evidence does not support her statements regarding significant weakness in her arm and leg and disabling back pain. She went for physical therapy from May into July of 2013, only two months, and this abolished her pain with lumbar flexion. In fact, she met one of five goals in this brief period of time she was discharged from therapy due to poor attendance. This ease in controlling and eliminating pain and her failure to continue with the therapy fails to support her allegations of ongoing, wholly disabling pain.

> . . . She claimed unemployment benefits after she alleged she was disabled and applied for office jobs. . . . A claim for unemployment benefits is inconsistent with a claim for disability. While hardly determinative, although she testified that her left arm had little strength, she used her left hand to open the heavy hearing room door while carrying large purse on the right.

(R. 17–18 (citations omitted)). Giving some but not "full weight" to Dr. Fiacco's opinion, she found a "residual functional capacity for a full range of sedentary work." (R. 18). The ALJ also factored in Plaintiff's testimony in including "the requirement that any jobs named can be performed in the sitting or standing position." (R. 18).

Having reviewed the February 10, 2015 "medical source statement" completed by LPN Stachnik and signed by Dr. Fiacco, which opined that Plaintiff could not work due to left-sided weakness, the ALJ explained that, "[s]ince an LPN is not able by training or education to make such an assessment and since the form appeared to be completely based on the claimant's complaints, [the ALJ] asked the claimant how this form was prepared." (R. 14–15). At the hearing, Plaintiff testified that she "went to the doctors, and they did it with me . . . and from their records." (R. 58). The ALJ thus "reviewed in detail" Dr. Fiacco's office notes from June 2011 to October 2014, which "contain[ed] little reference to symptoms" and did "not substantiate the significant limitations set out in the questionnaire with the exception of reports of fatigue." (R. 15). Absent "medical progress notes including reference to the limitations," the ALJ concluded that the assessment by LPN Stachnik and Dr. Fiacco was "unsupported but for the claimant's subjective allegations" and accordingly was "not a medical source statement, but only a separate compilation of the claimant's self-serving statements." (R. 15). The opinion of Dr. Fiacco, in other words, could not be given "controlling weight." (R. 15). Similarly, the ALJ found that the "same questionnaire" filled out by Dr. Shukri on February 23, 2015, opining that Plaintiff was unable to work due to left-sided weakness, was contradicted by Dr. Shukri's examinations in 2011, 2012, and 2014, which "found [Plaintiff] had normal strength in all four limbs, symmetrical muscle strength, and a normal gait." (R. 15–16). Therefore, the ALJ declined

to accord "controlling weight" to his opinion. (R. 16). The ALJ added that "in fact the claimant has denied muscular weakness." (R. 16 (citing R. 377)).

At step four, having determined Plaintiff's RFC, the ALJ determined that Plaintiff was capable of performing past relevant work as an accounts payable clerk for a hospital because this work did not require the performance of work-related activities precluded by her RFC. (R. 18 (citing 20 C.F.R. § 404.1565)). Relying on the vocational expert's testimony, which identified Plaintiff's job as a bookkeeper, the ALJ found that Plaintiff could perform the job "as actually and generally performed," considering her RFC and the physical and mental demands of this work. (R. 18).

Although Plaintiff could perform past relevant work, the ALJ considered, under step five, whether there were other jobs in significant numbers in the national economy for someone Plaintiff's age, education, work experience, and RFC. (R. 18–19). Based on the vocational expert's testimony, who identified jobs as a receptionist bookkeeper and general ledger bookkeeper, the ALJ concluded that, "considering her age, education, work experience, and residual functional capacity, the claimant acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy." (R. 19). The ALJ concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from May 31, 2012, through the date of this decision." (R. 19).

## III.    DISCUSSION

### A.    Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether a claimant is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been

applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential" and the Court can reject the facts that the ALJ found "only if a reasonable factfinder would have to conclude otherwise." *Id*. at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

### B.    Analysis

Plaintiff argues that the ALJ erred in several ways, specifically that: (1) the ALJ "erred by failing to follow the treating physician rule, giving no weight to Plaintiff's treating physicians"; (2) the ALJ "erred in failing to consider the proper Listing"; and (3) the ALJ's "RFC determination is not supported by substantial evidence because it is not supported by any medical opinion." (Dkt. No. 10, at 3).

### 1.    Opinions of Dr. Fiacco and Dr. Shukri

Plaintiff argues that ALK Koennecke incorrectly "rejected the opinions of both Plaintiff's treating physicians because they were not supported by the evidence in the record," and "ignored all evidence of Plaintiff's issue with her left side since the stroke." (*Id.* at 12).

According to the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)). In other words, the treating physician's opinion is not afforded controlling weight where it is inconsistent with other substantial evidence in the record, including opinions from other medical experts. *Id*. (citing

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). When the ALJ opts not to give a treating physician's opinion controlling weight, she must provide "good reasons" for doing so. *Id*. at 129 (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). "In order to override the opinion of a treating physician . . . the ALJ must explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). *See also* 20 C.F.R. § 404.1527(c).

### a. Dr. Fiacco

As an initial matter, Plaintiff is incorrect that the ALJ gave "no weight" to the opinions of Dr. Fiacco and Dr. Shukri. (R. 9). Because their assessments were not supported by evidence in the record and were contradicted by other substantial evidence, the ALJ reasoned, they could not be given "controlling weight." (R. 15–16). Therefore, the ALJ gave these assessments "the weight" accorded to Plaintiff's "statements in testimony" or to evidence "found elsewhere in the record." (R. 15; *see also* R. 18 ("In sum, weight is accorded the opinion of the LPN cosigned by Dr. Fiacco but not full weight for the reasons given.")).

Here, the ALJ applied the correct legal standard in evaluating Dr. Fiacco's opinion and provided "good reasons" for not according it controlling weight.  The ALJ considered the length of time Dr. Fiacco had treated Plaintiff treatment, (*see* R. 15 ("Dr. Fiacco's office notes were reviewed in detail from June 2011 into October 2014.")), and noted that, with the exception of reports of fatigue," none of Dr. Fiacco's office notes "substantiate[d] the significant limitations set out" in his assessment, "with the exception of reports of fatigue." (R. 15). Dr. Fiacco's assessment identified Plaintiff's symptoms as including limited range of motion of upper extremity, problems concentrating, dizziness, loss of balance, loss of coordination, fatigue,

slurred speech, and weakness or numbness in her fingers and toes. (R. 457). He estimated that, due to her functional limitations, Plaintiff: could sit for 30 minutes and stand for 10 minutes at a time; could sit and stand/walk less than two hours a day; could perform manipulative and reaching activities with her left hand only "rarely"; could "rarely" lift or carry objects weighing less than 10 pounds; was seriously limited in her ability to maintain attention for two hours and complete a workday without interruptions; was unable to maintain regular attendance, be punctual, and perform at a consistent pace without taking many breaks; would be off task more than 20% of the day; and would miss more than four workdays per month. (R. 458–60). Dr. Fiacco's office notes, however, indicate that, while Plaintiff complained of being tired, her physical exams were normal in the period from June 2011 to October 2014. (R. 374–79, 383–86, 393–95, 399–403, 422–24, 444–46). The ALJ observed that Plaintiff's reports of fatigue could explain Dr. Fiacco's assessment that Plaintiff could not maintain production pace, but he correctly declined to give "that aspect of the assessment . . . evidentiary weight" because production pace would depend on the job requirements. (R. 15). Therefore, the Court concludes that the ALJ provided "good reasons" supported by substantial evidence for not assigning controlling weight to Dr. Fiacco's opinion.

### b.  Dr. Shukri

Similarly, the Court finds no error in the ALJ's decision  not to accord controlling weight to Dr. Shukri's assessment—including his opinion that Plaintiff was unable to work due to left-sided weakness, (R. 463). Plaintiff acknowledged that Dr. Shukri prepared his assessment with her. (R. 58). In evaluating Dr. Shukri's opinion, the ALJ specifically noted that Dr. Shukri was Plaintiff's treating neurologist and saw Plaintiff from 2011 to 2014. (R. 15). The ALJ also noted, however, that Dr. Shukri "only saw [Plaintiff] once a year." (R. 15). Moreover, as the ALJ correctly observed, Dr. Shukri's examination reports for 2011, 2012, and 2014 indicate that

Plaintiff had "normal strength in all four limbs, symmetrical muscle length, and a normal gait," (R. 15–16; *see* R. 414–17, 420–21), contradicting his February 2015 opinion that she suffered from left-sided weakness.

Plaintiff takes issue with the ALJ's "[c]herry-picked evidence," arguing that the record contains many references to her complaints of left-sided weakness and numbness. (Dkt. No. 10, at 12). Plaintiff cites evidence in the record indicating that Plaintiff's "[r]apid alternating movements and fine movements of the left hand were slightly impaired on the left side" immediately after her stroke, (R. 453), that she was to be out of the office until November 17, 2010, (R. 414), that Plaintiff complained about left-sided weakness and left leg heaviness, (R. 357–59), that Plaintiff's physical therapy goals included goals such as increasing lower extremity strength to allow her to stand for 20 to 30 minutes without pain and abolishing left lower extremity parethesias, (R. 473), that Plaintiff was diagnosed with mild lumbar radiculopathy, with symptoms in the left L4–L5, in May 2013, (R. 419, 421), and that Dr. Shukri noted increased tone in the left extremities with mild hyperreflexia in April 2013. (R. 418).

But the ALJ did not err in relying on objective medical evidence in Dr. Fiacco's and Dr. Shukri's office notes showing that Plaintiff had a normal gait, intact reflexes, and normal strength in all four limbs and extremities, (R. 18 (citing R. 360, 374–79, 383–88, 393–95, 399–401, 421)).[5] Those objective observations were a proper basis for the ALJ's conclusion that "repeat examinations by [the] two providers fails to demonstrate the significant left-sided

---

[5] Further, at step 2, the ALJ explained that she

> combed through the medical records and the medical evidence does not contain any documentation of any left-sided weakness. Indeed, on March 14, 2013, Dr. Fiacco examined the claimant the claimant denied any muscular weakness and his neurological exam found normal bilateral deep tendon reflexes. In 2014, motor examination was normal. This same notation repeats throughout Dr. Fiacco's records.

(R. 13 (citations omitted)).

weakness alleged" and for the ALJ's rejection of their February 2015 assessments of Plaintiff's functional limitations. *See Lewis v. Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013) (affirming ALJ's determination where the treating physician's "final opinion was inconsistent with his own prior opinions and the findings of the other medical examiners, and was based on [the plaintiff's] subjective complaints"); *Gates v. Astrue*, 338 F. App'x 46, 49 (2d Cir. 2009) (affirming ALJ's decision to accord limited weight to a doctor's assessment "based on an unreliable foundation"—the plaintiff's "subjective complaints about his mental limitations"). Thus, the Court finds no legal error in the ALJ's evaluation of Dr. Shukri's opinion and concludes that the ALJ's decision not to accord it controlling weight is supported by substantial evidence.

## 2. Listed Impairments Ruling

Plaintiff argues that, at step three, the ALJ erred in failing to consider whether she met the criteria of Listing 11.04 (central nervous system vascular accident) "and did not provide a detailed analysis to allow proper review by this Court." (Dkt. No. 10, at 16). At step three, the ALJ determined that Plaintiff did not have an impairment meeting the severity of Listing 12.02 (organic brain disorders) or any of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. She explained:

> No testing has been suggested or done so, regarding listed impairment 12.02 (organic brain disorders), all that is in the record are the claimant's allegations about residuals following her cardiovascular accident. Allegations alone cannot establish [or] form the basis for establishing the severity required in a listed impairment.

(R. 14). The ALJ did not specifically consider Listing 11.04.

Plaintiff contends "there is evidence"—more specifically, proof of "significant and persistent disorganization of motor function in two extremities"—to support" a finding that she meets Listing 11.04. (*Id.* at 14–15). Under the regulations in effect at the time of the ALJ's

decision, Listing 11.04 (central nervous system vascular accident) requires "one of the following more than 3 months post-vascular accident":

> A. Sensory or motor aphasia resulting in ineffective speech or communication; or
> B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station.

20 C.F.R. pt. 404, subpt. P, app. 1, listing 11.04 (effective Aug. 12, 2015 to May 23, 2016).

Although the ALJ did not expressly state that she considered Listing 11.04, she did consider, as part of her RFC determination, the underlying medical criteria that Plaintiff would have had to satisfy—and that Plaintiff claims having met—under that listing.[6] Citing record evidence, the ALJ noted that Plaintiff's physical examinations in 2011, 2012, and 2013 were "normal" and that her June 2014 motor exam showed that her "motor and tone was normal in all four extremities, there was no tremor or involuntary movement, muscles had good consistency in all four limbs," "there was no focal or generalized atrophy or fasciculation," her strength "was normal in all four limbs," and "her gait was normal." (R. 18).

Given the ALJ's express citation to this evidence, the Court can "reasonably infer" that the ALJ found that Listing 11.04 was inapplicable to Plaintiff due to her failure to prove that she suffered "[s]ignificant and persistent disorganization of motor function in two extremities." *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982); 20 C.F.R. pt. 404, subpt. P, app. 1, listing 11.04(B). Indeed, the "clearly credible evidence" that Plaintiff's motor function, movement, gait or station were not impaired, (*see, e.g.*, R. 421 (Dr. Shukri noting that Plaintiff has a normal gait); R. 415 (Dr. Shukri finding on physical examination "normal gait," "[n]o incoordination,"

---

[6] Because Plaintiff does not assert that she presented evidence in support of any "[s]ensory or motor aphasia resulting in ineffective speech or communication," 20 C.F.R. pt. 404, subpt. P, app. 1, listing 11.04(A), the Court need not search the record for evidence of that condition. However, the Court notes that her treatment notes show that Plaintiff received normal scores in verbal and motor response on the Glasgow Coma Scale ("GCS") neurological test and had fluent speech without dysarthria or dysphasia. (R. 360, 414–15, 420–21).

and "motor and tone is normal in all four extremities")), shows that the ALJ's determination was supported by substantial evidence. Therefore, the Court finds no error in the ALJ's conclusion that Plaintiff did not have any condition meeting the severity of impairments listed in the regulations, including Listing 11.04. *See Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112–13 (2d Cir. 2010) (explaining that "the absence of an express rationale for an ALJ's conclusions" does not require reversal or remand if "other portions of the ALJ's decision" and "clearly credible evidence" show that "his determination was supported by substantial evidence" (quoting *Berry*, 675 F.2d at 469)); *Ryan v. Astrue*, 5 F. Supp. 3d 493, 507 (S.D.N.Y. 2014) ("An ALJ's unexplained conclusion [at] step three of the analysis may be upheld where other portions of the decision and other 'clearly credible evidence' demonstrate that the conclusion is supported by substantial evidence.").[7]

### 3.    Plaintiff's RFC

Lastly, Plaintiff argues that the ALJ's RFC determination—that Plaintiff had the RFC to perform the full range of sedentary work if given the ability to choose a sitting or a standing position—was "not supported by substantial evidence because she rejected the only medical opinions of record." (Dkt. No. 10, at 16). That argument fails.

"The RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations." *Klimek v. Colvin*, No. 15-cv-789, 2016 WL 5322022, at *9, 2016 U.S. Dist. LEXIS 129804, at *25 (N.D.N.Y. July 21, 2016), *report-recommendation adopted sub nom. Klimek v. Comm'r of Soc. Sec.*, 2016 WL 5256753, 2016 U.S. Dist. LEXIS

---

[7] The Court agrees with the Commissioner that the case Plaintiff relies on, *Ferency v. Astrue*, No. 10-cv-711, 2012 WL 2885426, at *4–5, 2012 U.S. Dist. LEXIS 97582, at *12–13 (N.D.N.Y. Apr. 30, 2012), *report-recommendation adopted by* 2012 WL 2885492, 2012 U.S. Dist. LEXIS 97579 (N.D.N.Y. July 13, 2012), is distinguishable. In that case, the Court found that opinions of the plaintiff's physicians indicated residual left-sided weakness and supported a finding that the plaintiff satisfied the criteria of Listing 11.04. Here, by contrast, substantial evidence supported the ALJ's conclusion that the assessments of Dr. Fiacco and Dr. Shukri were not based on, and were actually contradicted by, objective medical findings.

129491 (N.D.N.Y. Sept. 22, 2016). "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." *Roat v. Barnhart*, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010) (quoting *Martone v. Apfel*, 70 F.Supp.2d 145, 150 (N.D.N.Y 1999)). The regulations describe "sedentary work" as work that "involves lifting no more than 10 pounds at a time," occasionally lifting light objects, "sitting," and "a certain amount of [occasional] walking and standing." 20 C.F.R. § 404.1567(a). "The Social Security Administration has further explained that at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." *Penfield v. Colvin*, 563 F. App'x 839, 840 (2d Cir. 2014).

While Plaintiff is correct that an ALJ is "not free to set [her] own expertise against that of a physician who submitted" a competent opinion, *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998), an ALJ may still be able to determine a claimant's RFC from the evidence in the record, even absent a competent medical opinion. "Where . . . 'the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity,' a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (alteration in original) (citation omitted) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013)); *see also Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (upholding an ALJ's RFC determination where the ALJ "rejected" a physician's opinion but relied on the physician's findings and treatment notes). After all, an ALJ is "responsible for assessing [a claimant's] residual functional capacity," 20 C.F.R. § 404.1546(c), "based on all the relevant evidence in [the] case record," § 404.1545. *See also* § 404.1527 ("Although [the Commissioner] consider[s] opinions from medical sources on issues

such as . . . [a claimant's] residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner.").

Here, the ALJ properly relied on physician treatments notes and Plaintiff's testimony to determine her RFC. After holding that the opinions proffered by two of Plaintiff's physicians were not entitled to full weight, (R. 14–16)—a conclusion that is supported by substantial evidence, (*see supra* Part III.B.1)—the ALJ applied the two-step process under 20 C.F.R. § 404.1529(a) to evaluate Plaintiff's reported symptoms: first, the ALJ asked whether Plaintiff had medically determinable impairments that could produce the alleged symptoms; and second, the ALJ inquired into the symptoms' intensity, persistence, and limiting effects to determine the extent to which they limited Plaintiff's ability to work. (R. 16–18). She reviewed Plaintiff's July 27, 2013 function report and March 2, 2015 testimony, and concluded that Plaintiff's degenerative joint disease in the lumbar spine and residuals of her stroke "could reasonably be expected to cause" her symptoms. (R. 16–17). But other factors diminished the credibility of "her statements concerning the intensity, persistence and limiting effects of these symptoms"—in particular "her statements regarding significant weakness in her arm and leg and disabling pain." (R. 17).

This Court must "afford great deference to the ALJ's credibility finding, since the ALJ had the opportunity to observe [the claimant's] demeanor while [the claimant was] testifying."[8] *Kessler v. Colvin*, 48 F. Supp. 3d 578, 595 (S.D.N.Y. 2014) (alterations in original) (internal quotation marks omitted). In assessing Plaintiff's credibility, the ALJ here properly considered medical evidence suggesting that her motor functions, strength, and gait were normal. (R. 17–18). *See Pidkaminy v. Astrue*, 919 F. Supp. 2d 237, 248 (N.D.N.Y. 2013) (explaining that, when

---

[8] Plaintiff does not, however, specifically challenge the ALJ's credibility determination.

"assessing a claimant's credibility, the ALJ must consider both his medical records and his reported symptoms," and noting that a "claimant's statements about his condition, on their own, are not enough to establish disability" (citing 20 C.F.R. § 404.1529)). Likewise, the ALJ was entitled to consider Plaintiff's discharge from physical therapy due to poor attendance as a factor weighing against her subjective statements. (R. 17–18). *See* SSR 16-3p (stating that "if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record"). Nor did the ALJ err in considering Plaintiff's claim for unemployment benefits after the onset date as a factor adversely affecting her credibility. *See Felix v. Astrue*, No. 11-cv-3697, 2012 WL 3043203, at *10, 2012 U.S. Dist. LEXIS 102949, at *34 (E.D.N.Y. July 24, 2012) ("Courts in the Second Circuit have held that an ALJ may consider evidence that the claimant received unemployment benefits and/or certified that he was ready, willing, and able to work during the time period for which he claims disability benefits as adverse factors in the ALJ's credibility determination.").

In sum, the Court finds that the ALJ's RFC determination is supported by substantial evidence that "a reasonable person would find adequate to support" such a finding. *Provost-Harvey v. Comm'r of Soc. Sec.*, No. 06-cv-1128, 2008 WL 697366, at *8, 2008 U.S. Dist. LEXIS 19551, at *14 (N.D.N.Y. Mar. 13, 2008) (citing *Williams ex. Rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED**.

Dated: September 27, 2018
       Syracuse, New York

_Brenda K Sannes_
Brenda K. Sannes
U.S. District Judge